**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **THEODORE ARITA (# 422864)** | : | **CIVIL ACTION** |
| | : | **NO. 14-116-BAJ-SCR** |
| **VERSUS** | : | **JUDGE JACKSON** |
| **MAJOR HOOKER, ET AL.** | : | **MAGISTRATE JUDGE RIEDLINGER** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

**MAY IT PLEASE THE COURT:**

Movers, Joseph Hooker and Jimmy Smith, urge this Honorable Court to dismiss plaintiff's claims against them through summary judgment.

**I.   STATEMENT OF THE CASE**

Plaintiff, Theodore Arita, DOC#422864, is an inmate sentenced to the custody of the Louisiana Department of Public Safety and Corrections ("Department"), and at all times relevant hereto, was confined at Louisiana State Penitentiary ("LSP") in Angola, Louisiana.

The appearing defendants in this Motion are:

1. Joseph Hooker, a Corrections Major at LSP.

2. Jimmy Smith, a Corrections Colonel at LSP.

Plaintiff filed suit against the defendants pursuant to 42 U.S.C. Section 1983 alleging excessive force and deliberate indifference. As relief, inmate Arita seeks compensatory and punitive damages.

1

## II.    THE LAW ON SUMMARY JUDGMENT

FRCP Rule 56(e) provides in pertinent part as follows:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In Celotex Corp. v. Catrett[1] the Supreme Court held that the above language mandates summary judgment for judicial efficiency in situations where the adverse complainant shows insufficient evidence on any element essential to his case and on which complainant bears the burden of proof at trial.

The appearing defendants in this matter satisfy their initial responsibility in moving for summary judgment by informing the Court of the basis for their Motion through the Statement of Undisputed Facts and from the exhibits, which are:

Exhibit A:    Certified Copies of Joseph Hooker's Disciplinary and Unusual Occurrence Reports from November 29, 2012

Exhibit B:    Plaintiff's Rap Sheet, Conduct Record and Location Sheet

Exhibit C:    Plaintiff's Medical and Mental Health Records from November 29, 2012 – December 31, 2012

Exhibit D:    Pertinent Portion of Plaintiff's Medical and Mental Health Records from 2004 - 2012

Exhibit E:    Affidavit of Jimmy Smith

Exhibit F:    Affidavit of Dr. Paul Toce

---

[1]106 S. Ct. 2548 (1986).

Exhibit G:    Affidavit of Joseph Hooker

Exhibit H:     Pictures Taken of Plaintiff on November 29, 2012

Exhibit I:     Gas Log from November 29, 2012

## III.    MISREPRESENTATIONS IN THE VERIFIED COMPLAINT

Section I(C) on pages 2-3 of the complaint contains misrepresentations concerning lawsuits the plaintiff has previously filed. Specifically, in response to the question which asks whether plaintiff has previously filed federal lawsuits or appeals, related or unrelated to the issues raised in the complaint, plaintiff indicates that he filed suit in 2009 alleging failure to protect by security and that it was dismissed for failure to state a claim upon which relief can be granted. Contrary to the representations made by plaintiff, court records show that he filed 3 lawsuits before the instant one was filed on February 20, 2014.[2]

Also, the 2009 action referred to by plaintiff in the complaint, Arita v. Stagg (USM-09-158), was an excessive force and deliberate indifference case that was dismissed after a 5 day jury trial on October 4, 2013.

## IV.    CLAIMS OF VERBAL HARASSMENT AND/OR THREATS ARE NOT ACTIONABLE UNDER 42 U.S.C. § 1983

Plaintiff asserts a claim of  verbal harassment and/or threats in the complaint. However, mere verbal threats or verbal harassment are not actionable as constitutional violations.[3] Based upon the foregoing, any and all claims of alleged verbal harassment and/or threats that are asserted in the within action should be dismissed.

---

[2] See Case Nos. USM-10-425 and USM-11-850.
[3] Calhoun v. Hargrove, 312 F.3d 730, 734 (5th Cir. 2002).

### V.    MAJOR JOSEPH HOOKER AND COLONEL JIMMY SMITH SHOULD BE ENTITLED TO 11TH AMENDMENT IMMUNITY

Major Joseph Hooker and Colonel Jimmy Smith should be entitled to 11th Amendment immunity.

The State of Louisiana is endowed with sovereign immunity. In this regard, the Eleventh Amendment to the United States Constitution provides as follows:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

This Amendment precluding federal court jurisdiction over a suit against a state by a citizen of another state also applies to suits against a state or a state agency by its own citizens.

Unless sovereign immunity has been abrogated by an act of Congress or voluntarily waived by a state, the Eleventh Amendment of the Constitution provides immunity to the state from federal court lawsuits brought by private persons.[4] By enacting the Civil Rights Act, Congress did not abrogate the states' sovereign immunity from suit.[5] Pursuant to that statute, Louisiana has not waived its Eleventh Amendment immunity.[6]

Lawsuits against government officials acting in their official capacities are considered to be lawsuits brought against the entity of which they are agents.[7] For this reason, any claims asserted against Major Hooker and Colonel Smith, in their official capacities, must be treated as claims against the Louisiana Department of Public Safety and Corrections, for which, Eleventh Amendment immunity applies.

---

[4] Hughes v. Savell, 902 F.2d 376, 377-78 (5th Cir. 1990), citing Pennhurst State School & Hosp. v. Halderman, 104 S.Ct. 900, 908 (1984).
[5] Champagne v. Jefferson Parish Sheriff's Office, 188 F.3d 312 (5th Cir. 1999).
[6] See La.Rev.Stat. Ann. § 13:5106(A).
[7] See Kentucky v. Graham, 105 S.Ct. 3099 (1985) and Baker v. Putnal, 75 F.3d 190 (5th Cir. 1996).

Accordingly, Major Joseph Hooker and Colonel Jimmy Smith should be entitled to Eleventh Amendment immunity on the Section 1983 claims asserted against them in the present action.

## VI. MAJOR JOSEPH HOOKER AND COLONEL JIMMY SMITH SHOULD BE ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S CLAIMS OF EXCESSIVE FORCE AND DELIBERATE INDIFFERENCE

Major Joseph Hooker and Colonel Jimmy Smith should be entitled to qualified immunity on plaintiff's claims of excessive force and deliberate indifference.

### A. The Law on Qualified Immunity

*Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction and liability when they perform their duties reasonably.*[8] *Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.*[9]

Qualified immunity allows officials the freedom to exercise fair judgment, protecting "all but the plainly incompetent or those who knowingly violate the law."[10] *It also shields an officer from personal liability when the officer reasonably believes that his or her conduct complies with the law.*[11] The qualified immunity inquiry turns on the objective legal reasonableness of the

---

[8] Pearson v. Callahan, 129 S.Ct. 808, 815-816, 172 L.Ed.2d 565 (2009), citing Harlow v. Fitzgerald, 102 S.Ct. 2727, 2738 (1982).
[9] Pearson, 129 S.Ct. at 815-816.
[10] Malley v. Briggs, 106 S.Ct. 1092, 1096 (1986).
[11] Pearson, 129 S.Ct. at 823.

government official's action, assessed in light of legal rules that were clearly established at the time the action was taken.[12]

*The protection of qualified immunity applies regardless of whether government official's error is a mistake of law, a mistake of fact or a mistake based on mixed questions of law and fact.*[13] *The "driving force" behind the creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery.*[14] Consequently, the immunity issue must be resolved at the earliest possible stage of the litigation since it entails an entitlement to immunity from suit and not merely a defense to liability.[15]

### 2.    When is a right "clearly established"?

The determination of whether a right is "clearly established" involves 2 issues: (1) what body of case law to consult; and (2) how similar must the facts in the case law be to the fact in the current lawsuit.

**What body of case law?**  Obviously, cases from the Supreme Court and the 5th Circuit are controlling. In the absence of the controlling Supreme Court or 5th Circuit precedent, the law may be "clearly established" by a "consensus of cases of persuasive authority".[16] In order to "clearly establish" the law, this "consensus" must establish the contours of the right with "sufficient clarity" to provide the defendant with "fair warning" that the relevant conduct violates the plaintiff's constitutional rights. [17]

---

[12] Pearson, 129 S.Ct. at 823, citing Wilson v. Layne, 119 S.Ct. 1692 (1999).
[13] Pearson, 129 S.Ct. at 815-816, citing Groh v. Ramirez, 124 S.Ct. 1284 (2004).
[14] Pearson v. Callahan, 129 S.Ct. at 815-816, citing Anderson v. Creighton, 107 S.Ct. 3034 (1987).
[15] Hunter v. Bryant, 112 S.Ct. 534, 536 (1991).
[16] McClendon v. City of Columbia, 305 F.3d 314, 329-30 & 332 (5th Cir. 2002).
[17] Id. at 332.

### How similar must the facts be?

The court must determine whether an alleged right was established with sufficient particularity that a reasonable official could anticipate his actions would violate that right.[18] The law must give the defendant "fair warning" that his actions violated the plaintiff's constitutional rights.[19]

It is not enough that the law be established as a general proposition (such as that the 4th Amendment prohibits "unreasonable" searches and seizures or that the 8th Amendment prohibits "excessive" force). Rather, the right that the official is alleged to have violated must have been "clearly established" in a more particularized and more relevant sense.  Officials are not expected to determine the manner in which the law's gray areas might be clarified or defined.[20] Further, the Supreme Court has held that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[21]

### B.    Substantive Law on Excessive Force

The pertinent 8th Amendment proscription is only against "punishments" that are "cruel and unusual".[22] The core judicial inquiry when a prisoner alleges that prison officers used excessive force against the prisoner, in violation of the Eighth Amendment prohibition against cruel and unusual punishment, is not whether a certain quantum of injury was sustained, but rather whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.[23]

---

[18] Anderson v. Creighton, 107 S.Ct. 3034, 3039 (1987).
[19] Hope v. Pelzer, 122  S.Ct. 2508, 2516 (2002).
[20] Davis v. Scherer, 104 S.Ct. 3012, 3019-20 (1984).
[21] Malley v. Briggs, 106 S.Ct. 1092, 1096 (1986).
[22] Baldwin v. Stalder, 137 F.3d 836, 838 (5th Cir. 1998).
[23] Wilkins v. Gaddy, 130 S.Ct. 1175, 1178 (2010).

The 8th Amendment's prohibition of cruel and unusual punishment excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.[24] An 8th Amendment violation does not occur with every malevolent touch by a prison guard.[25] A necessary element of an excessive force claim is the proof of injury resulting from the use of force.[26]

### C.    Substantive Law On Failure to Protect and/or Insure Safety

The Constitution "does not mandate comfortable prisons",[27] but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment".[28] Under the Eighth Amendment, prison officials have a general duty to protect inmates from harm and take reasonable measures to protect their safety.[29] However, prison officials can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm.[30] The Eighth Amendment mandates "reasonable safety," not "absolute safety", and prison officials are not liable when they make good faith efforts in assessing potential danger.[31] Only deliberate indifference, "an unnecessary and wanton infliction of pain or acts repugnant to the conscience of mankind", constitutes conduct proscribed by the Eighth Amendment.[32]

---

[24] Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997) (quoting Hudson, 112. S.Ct. at 999).
[25] Hudson, 112. S.Ct. at 1000 and Wilkins, 130 S.Ct. 1178.
[26] Knight v. Caldwell, 970 F.2d 1430, 1432 (5th Cir. 1992), cert. denied, 113 S.Ct. 1298 (1993).
[27] Rhodes v. Chapman, 101 S.Ct. 2392 (1981).
[28] Helling v. McKinney, 113 S.Ct. 2475, 2480 (1993).
[29] Farmer v. Brennan, 114 S.Ct. 1970 (1994).
[30] Id.
[31] Newton v. Black, 133 F.3d 301, 307 (5th Cir. 1998).
[32] Estelle v. Gamble, 97 S.Ct. 285 (1976).

In order to prevail on a failure to protect claim, a plaintiff must demonstrate both that: (1) he was incarcerated under conditions posing a substantial risk of serious harm; and (2) the defendants' state of mind was one of deliberate indifference to his safety.[33]  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.[34]

Prison officials are not liable for failure to protect if: (1) "they were unaware of even an obvious risk to inmate health or safety", (2) "they did not know of the underlying facts indicating a sufficiently substantial danger", (3) "they knew of the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent", or as in the instant case, (4) "they knew of a substantial risk to inmate health or safety ⋯ [and] responded reasonably to the danger, even if the harm was not ultimately averted".[35]

A prison official's failure to alleviate a significant risk that he should have perceived but did not in fact perceive is <u>insufficient</u> to impose liability for deliberate indifference; he must have actual knowledge of that significant risk.[36]

1.    **Plaintiff's claims against Major Hooker and Colonel Smith in the complaint**

Plaintiff asserts the following against Major Hooker and Colonel Smith in the complaints:

a. At this point, Maj. Hooker overheard what was taking place and became extremely upset…Eventually stopping in front of my cell where he specifically stated, "You the one want to get into my business…Maj. Hooker started administering large amounts of chemical agents into my cell all about my face and body…I immediately started requesting to see a mental health worker because I needed to declare myself a mental health emergency. All these request

---

[33] <u>Horton v. Cockrell</u>, 70 F.3d 397, 401 (1995).
[34] See <u>Farmer</u>, 114 S.Ct. at 1979; see also <u>Reeves v. Collins</u>, 27 F.3d 174 (5th Cir. 1994).
[35] <u>Farmer</u>, 114 S.Ct. at 1982-83.
[36] <u>Id</u>. at 1980.

was completely ignored…I sat, suffering, unable to breathe for at leas[t] 15 to 20 minutes.

b. Moments later, my door was opened where tactical unit stood with Maj. Hooker and Col. Smith standing in the hallway watching whole incident…I also made another request to make a mental health emergency, but was immediately repelled from bars by Maj. Hooker with more chemical agents that were agaom administered to my face and body….

c. I specifically heard Maj. Hooker state…and continued to spray more chemical agents all about my eyes, face at close range…Once we arrived in lobby area of Gator unit, Maj. Hooker ordered these officers to put me into the shower area of Gator 3 left tier….

d. Once I turned over, Maj. Hooker entered the shower area and started to slap me and twisting my hand while I was still fully restrained…He [Hooker] then released another burst of chemical agents to the side of may face and exited the shower area.

e. I finally stood up in shower and noticed several officers standing around watching the whole incident and laughing. Most specifically, Col. Smith who I heard state, "That's the one like to sue officers, he's going learn that no one will believe a violent inmate over us."

Rec. Doc. 1, pp. 5 - 7.

### 2.  Discussion

### a.  Plaintiff's Claim of Excessive Force and Deliberate Indifference Against Major Joseph Hooker

Plaintiff alleges Major Joseph Hooker subjected him to excessive force on the Gator 3 right tier of Camp J on November 29, 2012 by releasing "large amounts" of chemical agent into his cell without provocation 4 different times, slapping him and twisting his hand. (Plaintiff fails indicate where on his body Hooker allegedly slapped him or specify which hand Hooker allegedly twisted in the complaint). Inmate Arita also alleges Hooker told tactical team members

10

to beat him, that the tactical team violently beat him by shocking him, punching him, kneeing him in the head, kicking and stomping on him for 15 – 20 minutes and also that Hooker stood by and watched.[37]

Plaintiff, who has acknowledged that he has uncontrollable anger problems,[38] was housed in Cell No. 9 on the Gator 3 right tier of Camp J on November 29, 2012. Camp J is the most restrictive part of the prison. At approximately 8:25 a.m. on November 29, 2012, plaintiff began to cause a disturbance on the tier by racking down and throwing objects out of his cell. A cell extraction was being conducted on offender Michael Steward, who was in cell #7 of the same unit, while plaintiff was creating the disturbance.[39]

Major Hooker gave plaintiff several orders to stop the disruption and he refused all orders given. The cell extraction was then conducted on Steward. Major Hooker then exited the tier and obtained a can of Sabre Red Phantom Chemical agent. Hooker gave plaintiff several more direct verbal orders to cease the disturbance he was creating when he returned to the front of plaintiff's cell. Again, inmate Arita refused all orders given.[40]

At that point, Major Hooker administered a one second burst of chemical agent into the cell. Can B of Sabre Red, which is the can of mace Major Hooker retrieved from the gas locker on November 29, 2012, weighed 4.0 ounces before it was used. Can B weighed 3.7 ounces after Hooker released the chemical agent into the plaintiff's cell on the aforementioned date.[41] Three tenths of an ounce of mace was used by Hooker in a good faith effort to try to gain control of the plaintiff.

---

[37] Rec. Doc. 1, pp. 4-7.
[38] See Rec. Doc. 1, p. 7; see also Exhibit D.
[39] Exhibits A and G.
[40] Id.

Hooker ordered plaintiff to cease the disturbance he was creating after chemical agent was released. Plaintiff refused all orders given and picked up a stack of papers and threw them at the cell bars. The situation created by the plaintiff necessitated some degree of force, as attempts to gain his compliance through direct verbal orders and chemical agents were unsuccessful. Since plaintiff failed to comply with direct verbal orders to cease the disturbance he was creating, Major Hooker ordered the cell entry team to remove him from his cell.[42] Plaintiff was written up for defiance and aggravated disobedience as a result of his behavior.[43]

In accordance with LSP's use of force policy, the only force that was used on plaintiff on November 29, 2012 was that which was necessary to gain control of the situation he created when he refused to stop the disturbance he was creating.

Contrary to the allegations asserted by plaintiff in the complaint, Major Hooker did not release three tenths of an ounce of chemical agent into his cell on November 29, 2012 without provocation. As evidenced by the gas logs, Hooker likewise did not subject him to excessive force by repeatedly releasing large amounts of chemical agent in to his cell. Additionally, Hooker did not slap plaintiff or twist his hand while he was in restraints nor did he stand by and watch or laugh while cell entry team members allegedly beat him on November 29, 2012. Finally, Major Hooker did not direct cell entry team members to beat plaintiff.

*In the instant case, plaintiff did not sustain any injuries from the use of chemical agent by Major Hooker and he doesn't allege that he did*. In the absence of a physical injury, the only inference that can be drawn is that the force that was used on plaintiff on November 29, 2012,

---

[41] Exhibit I.
[42] Exhibits A and G.
[43] Exhibit A.

12

was used in a good faith effort to maintain and restore discipline. Clearly, the use of chemical agent by Major Hooker was necessary to bring the situation created by plaintiff under control.

Major Joseph Hooker should be entitled to qualified immunity on the claims asserted against him in this case.

**b.    Plaintiff's Very Own Medical Complaints at the Infirmary on November 29, 2012 Rebut a Finding of Excessive Force**

The medical evidence shows that plaintiff voiced no medical complaints related to alleged overexposure to chemical agent or that one of his hands had been twisted on November 29, 2012. Moreover, in the complaint, inmate Arita makes no allegations of injury relating to alleged exposure to large amounts of chemical agent "all about his face and body" and eyes.[44] Finally, plaintiff fails to specify where on his body he was allegedly slapped, and there is no evidence, medical or otherwise, to support that allegation.

Plaintiff's allegations of repeated exposure to "large amounts" of chemical agent is not supported by the medical evidence,  by the allegations asserted by him in the complaint or by the gas logs from November 29, 2012.[45]

**c.    The Medical Evidence[46]**

In the complaint, plaintiff alleges his right elbow was swollen, his left knee was injured and his back was "badly" injured as a result of allegedly being abused on November 29, 2012.

Plaintiff was examined at approximately 9:15 a.m. on November 29, 2012, at which time he complained of back, face, head discomfort, dizziness and neck pain. The examination of inmate Arita was unremarkable. His vital signs were stable, he was alert, ambulatory and he had

---

[44] Rec. Doc. 1, pp. 5 - 6.
[45] Exhibit I.
[46] Exhibit F.

13

no neurological symptoms. The medical examination revealed no significant injuries on plaintiff's person. He was given a follow-up appointment with a nurse practitioner. X-rays of inmate Arita's knee, neck, back, thorax and skull were taken. All of the x-rays were negative, with the exception of the x-ray of his back which showed degenerative disc disease with no fracture malalignment or spondylolisthesis.[47]

Pictures taken of plaintiff on November 29, 2012 show he had an acute minor abrasion on his left thumb and that he had old wounds, none of which were acute, on his back and buttocks.[48]

At approximately 5:43 on November 30, 2012, plaintiff was examined for complaints of a swollen right elbow he was barely able to move, severe pain in his left knee he could barely put weight on, that his lower back was reinjured, that he could barely stand up straight or bend his back and that he was in severe pain as result of the cell entry that occurred on November 29, 2012. His vitals were within normal limits, he had moderate edema on his right elbow with mild discoloration noted. There was mild edema with no discoloration on his left knee. No edema, spasms or discoloration was noted on his back. He received a prescription for Naproxen.

Inmate Arita has arthritis, which is a degenerative disease, in his back. He has received medical treatment on his back since as early as September 1, 2004. MRI's that were taken of his back on June 19, 2008 and September 15, 2009 revealed degenerative changes. Plaintiff previously received medical treatment on his left knee on October 26, 2004 and on March 7, 2012. Also, he received an x-ray on his right elbow due to trauma on January 10, 2005.[49]

Plaintiff was in his cell from the time he left the infirmary at approximately 10:10 a.m. on November 29, 2012 until he received medical evaluation at approximately 5:43 am on November

---

[47] Exhibit C.
[48] Exhibit H.

30, 2012. The picture that was taken of inmate Arita's elbows and knees at the infirmary on November 29, 2012 reveal no redness and/or injury. There exists no medical evidence that he reinjured his back on the aforementioned date.

On December 4, 2012, plaintiff was examined for complaints of discomfort and severe pain in his butt bone and severe pain in his left shoulder since November 29, 2012.  His vitals were within normal limits, he was ambulatory without distress, no deformities or discoloration was found on his extremities. Plaintiff would not let the medical professional check his spine. He received a 3 day supply of Ibuprofen.

Inmate Arita complained of severe complications, difficulty and pain in his left knee, left shoulder, blistered skin from chemical agent and pain in his butt to the extent that he could not sit and lay down at approximately 8:45 a.m. on December 10, 2012.  Plaintiff was ambulatory and alert during the examination. There were no significant signs of trauma or distress. The examination revealed no obvious deformity, no sign of skin irritations. He also had good flexion and extension in both lower extremities and lumbar spine.

He was seen in the clinic at approximately 12:35 p.m. on December 10, 2012, at which time he complained of low back pain and buttocks pain post "kick." Plaintiff walked without a limp, moved easily in the chair without complaints of low back pain. He had good lumbar spine range of motion with no specific points of tenderness.

In Dr. Paul Toce's medical opinion, inmate Arita was not subjected to excessive force on November 29, 2012.

---

[49] Exhibit D.

**d.     Plaintiff Made No Specific Mental Health Complaints Concerning the Alleged Events Giving Rise to the Lawsuit from November 29, 2012 – December 31, 2012**

Plaintiff made no specific mental health complaints concerning the alleged events giving rise to the lawsuit from November 29, 2012 – December 31, 2012.[50]

**e.     The Photographs of Plaintiff Taken on November 29, 2012**

The photographs that were taken of plaintiff at the infirmary on November 29, 2012 rebut a finding of excessive force or deliberate indifference. Pictures taken of plaintiff on November 29, 2012 show he had an acute minor abrasion on his left thumb and that he had old wounds, none of which were acute, on his back and buttocks.[51]

Plaintiff alleges the E.M.T. who took the pictures avoided taking photographs of his face and only took pictures of the top of his head. That statement is clearly untrue. Photographs of plaintiff's entire body, from his head to his feet, were taken on November 29, 2012.

Plaintiff also alleges the photographer failed to take pictures of the right side of his face, which was swollen. He also alleges pictures of his eye, which was almost completely shut, were not taken. Again, the photograph reveals that the right side of plaintiff's face is not swollen and his eyes are closed, not shut from allegedly being hit.

**f.     Plaintiff's Claim of Deliberate Indifference Against Colonel Jimmy Smith**

The allegations asserted by inmate Arita against Colonel Jimmy Smith in the complaint are untrue. Colonel Smith was the ranking supervisor in charge of all of Camp J on November 29, 2012. Smith was not on the Gator 3 right unit when the alleged events giving

---

[50] Exhibit C.
[51] Exhibit H.

16

rise to the lawsuit occurred. Smith was informed of the incident, however he was unable to report to the unit because he was performing other duties at Camp J.[52]

The claim of deliberate indifference that is asserted against Colonel Jimmy Smith in the within action fails to state a claim upon which relief can be granted, as there is no evidence that inmate Arita was subjected to excessive force on November 29, 2012. Accordingly, the deliberate indifference claim should be dismissed and Colonel Jimmy Smith should be entitled to qualified immunity.

**g.    There Exists No Genuine Issue of Material Fact with Respect to the Excessive Force and Deliberate Indifference Claims**

A court may only grant summary judgment if there is no genuine issue of material fact.[53]

A necessary element of the excessive force claim is the proof of injury resulting from the use of force.[54] The extent of injury suffered is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation.[55] Also, the extent of injury may also provide some indication of the amount of force applied.

There is no evidence in the record sufficient to create a genuine dispute for trial as to whether Major Joseph Hooker subjected the plaintiff to an excessive use of force by releasing large amounts of chemical agent into his cell, by slapping him or by twisting his hand on November 29, 2012. There likewise exists no genuine dispute for trial as to whether Major Hooker was deliberately indifference to inmate Arita's safety. Finally, there is no evidence in the record that Col. Jimmy Smith failed to intervene on plaintiff's behalf because he was not subjected to excessive force.

---

[52] Exhibit E.
[53] Federal Rules of Civil Procedure Rule 56.
[54] Knight v. Caldwell, 970 F.2d 1430, 1432 (5th Cir. 1992), *cert. denied,* 507 U.S. 926, 113 S.Ct. 1298 (1993).

In light of the fact that the medical evidence, gas log, photographs of plaintiff and the defendants' accounts rebut the allegations asserted by him against in the lawsuit, summary judgment should be granted in favor of the defendants.

## VII.    CONCLUSION

For the reasons stated above, the defendants' Motion for Partial Summary Judgment should be granted and the plaintiff's complaint dismissed.

Respectfully submitted,

**JAMES D. "BUDDY" CALDWELL**
**ATTORNEY GENERAL**

BY:    s/ Stacey Johnson
Stacey Johnson
Bar Roll No. 27331
Assistant Attorney General

Louisiana Dept. of Justice
Litigation Division
1885 N. 3rd Street, 4th Floor
P.O. Box 94005
Baton Rouge, LA 70802
Telephone: (225) 326-6402
Facsimile: (225) 326-6495
Johnsonst@ag.state.la.us

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2014, a copy of the foregoing Memorandum in Support of Motion for Partial Summary Judgment was filed electronically with the Clerk of Court using the CM/ECF system. I also certify that I have mailed by United States Postal Service, Return Receipt No. 7011 3500 0003 2439 3728, this filing to the following non-CM/ECF participant:

Theodore Arita, DOC #422864

---

[55] Wilkins v. Gaddy, 130 S.Ct. 1178.

18

Louisiana State Penitentiary
Angola, LA  70712

s/ Stacey Johnson
Stacey Johnson # 27331
Attorney for Defendants
